UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Sage Products LLC, *Plaintiff*, v. Federal Insurance Company, *Defendant*. | No. 19 CV 5308  Judge Lindsay C. Jenkins |

MEMORANDUM OPINION AND ORDER

This case began as a breach of contract action by Sage Products LLC against ChemRite CoPac, Inc. after ChemRite provided Sage with adulterated products for oral hygiene kits. Sage and ChemRite reached a settlement, the terms of which included ChemRite assigning Sage its claims against its insurer, Federal Insurance Company. Sage then stepped into ChemRite's shoes and sued Federal for $6 million, the maximum under ChemRite's policy.[1] Before the Court are Sage's and Federal's cross-motions for summary judgment. [Dkt. 204, 214.] For the reasons stated below, Sage's motion is denied, and Federal's motion is granted.

I. Background

A. Factual History

The Court draws on the parties' Local Rule 56.1 statements to present the relevant facts. By and large, the facts are undisputed. Sage manufactures and supplies oral hygiene products for patients in hospitals and nursing homes, including

---

[1] Two notes: First, this case is styled *Sage Products, LLC v. ChemRite CoPac, Inc.* on the docket, but the Court follows the parties' lead in styling the caption to reflect the current litigation posture. Second, ChemRite had more than one relevant policy, but that fact is not material to this outcome of this case, and the Court uses the singular for convenience.

1

its "Q-Care Oral Cleansing and Suctioning Systems," or "Q-Care Kits." [Dkt. 216-1 ¶ 3.] The kits comprise individually sealed, connected sleeves that are easily detachable. [*Id.* ¶¶ 5, 10.] Each sleeve contains a toothbrush, a swab, and one of several "oral rinse solutions." [*Id.* ¶ 6.] Q-Care Kits are single-use products that provide the supplies necessary for one day of oral care. [*Id.* ¶¶ 5–6.] When using a kit, "healthcare staff detaches one sleeve from the rest, bursts the rinse packet inside the sealed sleeve to saturate the swab and brush, and tears open the sleeve to provide the care." [*Id.* ¶ 12.] The Q-Care Kit packaging, including the detachable nature of the sleeves, "is integral to the product's usefulness." [*Id.* ¶ 11.]

Sage supplies most of the Q-Care Kit components, but it contracted with ChemRite to manufacture and supply the oral rinse solutions. [*Id.* ¶¶ 7–8.] Both Sage and ChemRite are regulated by the Food and Drug Administration ("FDA"). [*Id.* ¶ 13.] On June 29, 2017, the FDA issued a warning letter to ChemRite, finding that its process for manufacturing the oral rinse solutions did not conform to relevant standards, including because ChemRite manufactured the solutions using the same equipment it used to make toxic car wash. [*Id.* ¶¶ 14–17.] ChemRite informed Sage about the warning letter the next day, and the FDA issued a warning letter to Sage on July 17, 2017. [*Id.* ¶¶ 18–21.] Sage recalled and stopped distribution of all products that used ChemRite's oral rinse solutions; under federal guidelines, Sage was required to remove the tainted rinse from the kits to dispose of it, which required Sage "to tear open each sleeve of each Q-Care Kit." [*Id.* ¶¶ 22–25.]

While the parties agree about the mechanics of using the kits, they dispute whether a kit can be resealed once opened. [*See id.* ¶¶ 12, 26–27 (Sage asserting kits cannot be restored and are useless once opened; Federal arguing that it would be technically possible to reseal kits).] Given the grounds on which the Court rules, this dispute is immaterial. In any event, it is undisputed that Sage lost tens of millions of dollars in profits from the recall of its Q-Care Kits. [*Id.* ¶¶ 32–33.]

## B. Procedural History

Sage filed this case against ChemRite in August 2019. [*Id.* ¶ 28.] ChemRite sought defense and indemnification from its insurer, Federal, which did not defend ChemRite but instead paid for its defense. [*Id.* ¶¶ 38–39.] During the course of the litigation, Sage and ChemRite engaged in mediation in late 2021 [*id.* ¶¶ 47–50], and Federal moved to intervene, seeking a judicial determination that Federal was not required to defend or indemnify ChemRite [*id.* ¶¶ 51–52]. The Court granted the motion and Federal filed its complaint against ChemRite, but soon after, Sage and ChemRite agreed to a settlement, and ChemRite and Federal dismissed their claims against each other without prejudice. [*Id.* ¶¶ 55–56, 60.]

The settlement agreement provided for a consent judgment of $13 million against ChemRite. [*Id.* ¶ 57.] ChemRite would pay $4 million, plus a contingent payment of $500,000 depending on Sage's recovery from Federal, and ChemRite would assign its rights to insurance payments from Federal to Sage. [*Id.*] In exchange, Sage released its claims against ChemRite agreed not to attempt to collect any more of the judgment from ChemRite. [*Id.*] The Court entered the consent judgment, and Sage filed its First Amended Complaint against Federal, seeking $6 million, the

3

maximum possible recovery under ChemRite's policy. [*Id.* ¶¶ 60–61.] The parties then filed cross-motions for summary judgment. [Dkt. 204, 214.]

## II. Legal Standard

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Frazier-Hill v. Chi. Transit Auth.*, 75 F.4th 797, 802 (7th Cir. 2023). When considering cross-motions for summary judgment, the Court views the facts in the light most favorable to party against whom the motion under consideration is made. *Frazier-Hill*, 75 F.4th at 802. A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022).

## III. Analysis

### A. Applicable Law

This case is in federal court based on diversity of citizenship jurisdiction, 28 U.S.C. § 1332(a), and it is undisputed that Wisconsin law governs. [Dkt. 204-1 at 5; Dkt. 216 at 2.] When analyzing a claim for insurance coverage, the Court "examine[s] the terms of the policy and compare[s] it to the facts in the record." *5 Walworth, LLC v. Engerman Contracting, Inc.*, 992 N.W.2d 31, 38 (Wis. 2023) (citation omitted). The analysis has three steps. "First, [the Court] determine[s] if the policy makes an initial grant of coverage. If so, [it] examine[s] the various exclusions to see whether any of them preclude coverage. Finally, should any exclusion apply, [the Court] look[s] to see whether any exception to that exclusion reinstates coverage." *Id.* (cleaned up).

4

As relevant here, ChemRite's policy provides that Federal must "pay 'damages that [ChemRite] becomes legally obligated to pay by reason of liability' for 'property damage caused by an occurrence to which this coverage applies.'" [Dkt. 216-1 ¶ 68 (alteration in original).] The parties raise several issues, but the Court focuses on a single dispositive point: whether there was an "occurrence" within the meaning of the policy. As the Court will explain, the losses Sage suffered were not the result of an "occurrence," so there was no initial grant of coverage, and Federal is not obligated to pay a claim. *See 5 Walworth*, 992 N.W.2d at 38.

Federal's policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." [Dkt. 216-1 ¶ 70.] "Accident" is not defined in the policy. The Supreme Court of Wisconsin interpreted identical contractual language in *5 Walworth*, which "Wisconsin courts have interpreted … many times." 992 N.W.2d at 42. Two principles are relevant here. First, under Wisconsin law, "while faulty workmanship is not an 'occurrence,' faulty workmanship may cause an 'occurrence.'" *Id.* at 42 (internal quotation omitted). The court cited cases involving faulty workmanship: inadequate site-preparation advice regarding a warehouse foundation, *Am. Fam. Mut. Ins. Co. v. Am. Girl, Inc.*, 673 N.W.2d 65, 69–70 (Wis. 2004); improperly installed windows, *Kalchthaler v. Keller Const. Co.*, 591 N.W.2d 169, 170–71 (Wis. Ct. App. 1999); and faulty soil excavation techniques, *Acuity v. Soc'y Ins.*, 810 N.W.2d 812, 818 (Wis. Ct. App. 2012). In each of these cases, *5 Walworth* explained, the work done by the insured was faulty, but there was no "occurrence" until that work caused property damage. 992 N.W.2d at 42–43.

5

Second, the court discussed how to interpret "accident" when that term is not defined in a policy. *Id.* at 42. The court relied on its earlier decision in *American Girl*, *id.*, which drew the meaning of "accident" from dictionary definitions:

> The dictionary definition of "accident" is: "an event or condition occurring by chance or arising from unknown or remote causes." *Webster's Third New International Dictionary of the English Language* 11 (2002). Black's Law Dictionary defines "accident" as follows: "The word 'accident,' in accident policies, means an event which takes place without one's foresight or expectation. A result, though unexpected, is not an accident; the means or cause must be accidental." *Black's Law Dictionary* 15 (7th ed.1999).

*Am. Girl*, 673 N.W.2d at 76. Other decisions by the Supreme Court of Wisconsin have construed an "accident" to mean "an event or condition occurring by chance or one that arises from unknown causes, and is unforeseen and unintended," *Stuart v. Weisflog's Showroom Gallery, Inc.*, 753 N.W.2d 448, 456 (Wis. 2008), and to mean "an unexpected, undesirable event or an unforeseen incident which is characterized by a lack of intention," *Doyle v. Engelke*, 580 N.W.2d 245, 250 (Wis. 1998) (cleaned up), *overruled on other grounds by Talley v. Mustafa Mustafa*, 911 N.W.2d 55 (Wis. 2018). Despite slightly different wording, these definitions of accident all get at the same concept. *See Est. of Sustache v. Am. Fam. Mut. Ins. Co.*, 751 N.W.2d 845, 853–58 (Wis. 2008) (relying on all three cases' interpretations of "accident"). "To determine whether an act is accidental," the Court "need only determine whether the occurrence giving rise to the claims was an unintentional act in the sense that it was not volitional." *Stuart*, 753 N.W.2d at 459 (footnote omitted).

6

## B. Application

Sage identifies two events that it believes caused "property damage" under the policy: the incorporation of ChemRite's tainted rinse solutions into the Q-Care Kits and the physical removal of the rinse packets from the kits. [Dkt. 204-1 at 6–9.] The resulting losses can only be compensable if the underlying event constitutes an "occurrence" within the meaning of the policy. *5 Walworth*, 992 N.W.2d at 38. The Court considers each in turn.

### 1. Incorporating the Rinse Packets

Sage argues that incorporating ChemRite's tainted rinse products into its Q-Care Kits was an occurrence. [Dkt. 204-1 at 9; Dkt. 220 at 9–10.] As Federal notes, this contention is contrary to Wisconsin law. [Dkt. 216 at 2.] *5 Walworth* reiterated the principle that "faulty workmanship is not an occurrence, but faulty workmanship can lead to an occurrence that causes property damage." 992 N.W.2d at 42–43. Sage attempts to distinguish between the faulty workmanship—ChemRite's "production of oral rinse products on the same line it used to produce toxic car wash"—and the resulting occurrence—"when Sage incorporated the adulterated product into the Q-Care Kits." [Dkt. 20 at 9–20.] This argument is unavailing for two reasons.

First, Wisconsin law recognizes installation as part of workmanship. When *5 Walworth* described the faulty workmanship in *American Girl*, it observed that "faulty workmanship caused soil to settle." 992 N.W.2d at 42 (citation omitted). The faulty workmanship was a subcontractor's poor advice, which the general contractor acted on while constructing a warehouse. *Am. Girl*, 673 N.W.2d at 69–70. If Sage were correct that a third party incorporating an insured's faulty workmanship into

7

its product were an occurrence, then the occurrence in *American Girl* would have come when the building was constructed. But it was the settling of the soil, not the construction of the building, that was an occurrence. *5 Walworth*, 992 N.W.2d at 42. ChemRite providing Sage with tainted rinse packets is akin to the bad advice in *American Girl*, and Sage incorporating those packets into its kits is analogous to building the warehouse in reliance on the advice. *5 Walworth* teaches that neither of those events constitutes an occurrence.

Sage cites two cases from other jurisdictions in support of its position that incorporating faulty workmanship into a product constitutes an occurrence. [Dkt. 204-1 at 9.] Even setting aside the fact that these cases could not overcome binding Wisconsin precedent, neither is persuasive on its own terms. *National Union Fire Insurance Co. of Pittsburgh v. Terra Industries, Inc.* involved an accidental carbon dioxide leak, and the requirement that an occurrence be an accident was not raised. 346 F.3d 1160, 1162–63 (8th Cir. 2003). And *Netherlands Insurance Co. v. Main Street Ingredients, LLC*, involving adulterated instant milk, applied Minnesota law, under which "lack of specific intent to injure [is] determinative" as to whether there was an "accident," a different standard than under Wisconsin law. 2013 WL 101876, at *3 (D. Minn. Jan. 8, 2013) (cleaned up).[2]

---

2   The parties also address the discussion of faulty workmanship in *Wisconsin Pharmacal Co., LLC v. Nebraska Cultures of California, Inc.*, 876 N.W.2d 72 (Wis. 2016), a case that *5 Walworth* overruled on other grounds. In *Pharmacal*, the court discussed these principles, stating that "we are not persuaded, simply because [the insured] accidently supplied a defective ingredient, that this constitutes an 'occurrence' for purposes of coverage under the policy." 876 N.W.2d at 85. Sage objects that this part of *Pharmacal* was dicta because the court had already determined that there was no coverage under the insurance

Second, even assuming incorporation of ChemRite's rinse solutions into the Q-Care Kits can be construed as an occurrence, it does not help Sage because that incorporation was intentional, not accidental. [*Cf.* Dkt. 225 at 3–4 (noting that *Pharmacal*, 876 N.W.2d at 88–89, reasoned similarly, but omitting that the court was applying California law).] Sage and ChemRite intended that the rinse solution packets would be incorporated with the other Q-Care Kit components and sealed— that was the purpose of their contract. But Federal owes coverage only for losses resulting from an "occurrence," defined as an "accident." No one could say that the incorporation of the rinse solutions "occurr[ed] by chance" or was "unforeseen and unintended," *Stuart*, 753 N.W.2d at 456, or that it was "characterized by a lack of intention," *Doyle*, 580 N.W.2d at 250 (cleaned up)). Nor can the fact that no one anticipated that ChemRite would provide a tainted product save Sage. *American Girl* makes clear that an unexpected result alone does not constitute an accident; "the means or cause must be accidental." 673 N.W.2d at 76 (internal quotation omitted).

From any angle, therefore, Sage incorporating ChemRite's rinse solutions into its Q-Care Kits was not an "occurrence" within the meaning of the policy.

## 2. Removing the Rinse Packets

Next, Sage argues that removing ChemRite's rinse solutions from its Q-Care Kits constituted an occurrence. [*See* Dkt. 204-1 at 7–9.] Here, too, the requirement

---

policy. [Dkt. 220 at 10.] Sage also contends that *Pharmacal* said that the insured's "provision of a defective ingredient" is the faulty advice because the court analogized it to the provision of faulty advice in *American Girl*. [*Id.* (quoting *Pharmacal*, 876 N.W.2d at 85).] The Court has explained, however, that *5 Walworth* precludes reading *American Girl* to define the faulty workmanship as the advice alone, separate from the installation.

9

that an occurrence be accidental dooms Sage. It is undisputed that Sage recalled the Q-Care Kits, opened them, and disposed of the tainted oral rinse solutions because it was required to under government guidelines. [Dkt. 216-1 ¶¶ 19–24.] These were intentional and volitional acts, not accidents. *See Doyle*, 580 N.W.2d at 250; *Stuart*, 753 N.W.2d at 459. Moreover, the damage to and loss of value of Sage's kits was expected once Sage began to comply with its obligations; these results did not occur "without [Sage's] foresight or expectation." *Am. Girl*, 673 N.W.2d at 76 (internal quotation omitted). Of course, Sage's purpose was not to ruin tens of millions of dollars of merchandise—nor, presumably, was that the FDA's purpose in issuing its warning letter—but that distinction does not control under Wisconsin law. For an event to be an accident, "the means or cause must be accidental." *Id.* (internal quotation omitted).

Sage might respond that the FDA only issued its warning letter because ChemRite produced adulterated rinse solutions, so Sage removed the rinse packets because of ChemRite's faulty workmanship. But there is no evidence that there was any accident involving the rinse packets after ChemRite provided them and Sage incorporated them into its Q-Care Kits [*see* Dkt. 216 at 3 ("Sage does not contend the solution leaked or otherwise caused accidental damage to tangible property.")], so arguing that ChemRite's faulty work caused Sage's damages simply amounts to rephrasing the argument that faulty workmanship is itself an occurrence. Consider the *American Girl* analogue: Soon after the warehouse is built and before any damage occurs, the soil engineer (or someone else) realizes he has given poor advice and

10

informs the owner, who requires the warehouse to be torn down and rebuilt. *Cf.* 673 N.W.2d at 69–70. In this scenario, the faulty workmanship triggered the owner's demand that the warehouse be rebuilt, but that workmanship did not cause an accident. The only difference with the situation here is that an outside party, the FDA, required the recall, but because those actions were intentional, not accidental, they do not amount to an occurrence.

Any damage or loss of use that resulted from Sage's recall of the Q-Care Kits and its removal of ChemRite's rinse solutions was not caused by an "occurrence" within the meaning of the policy. Therefore, the policy did not make an initial grant of coverage, and Sage cannot recover against Federal. *5 Walworth*, 992 N.W. at 38.

### III. Conclusion

The undisputed evidence establishes that there was no "occurrence" within the meaning of ChemRite's insurance policy, so Federal is not required to make any payment to Sage on that policy. Thus, the Court denies Sage's motion for summary judgment [Dkt. 204] and grants Federal's motion for summary judgment [Dkt. 214]. Judgment shall enter in favor of Federal and against Sage. Civil case terminated.

Enter: 19-cv-5308
Date: October 25, 2023

_____
Lindsay C. Jenkins
United States District Judge